Caruthers, J.,
delivered the opinion of the Court.
The original bill was filed by Benjamin J. Vaden, administrator of his father, Lodwick Vaden, to obtain the possession of about sixteen slaves, as a part of the estate, from Ann Vaden, the widow, who sets up a claim to them for her life, and the remainder in her sister, Elizabeth McCrary, and Polly Johns, the sister of her first husband, under his nuncupative will. So she denies that they were the property of her late husband, or are now a part of the assets to which complainant is entitled.
The cross-bill is filed to set up and have protected this remainder right.
The Chancellor sustained the claim of the administrator, and dismissed the cross-bill. The facts are as follows:
Isaac Johns, the first husband of Ann, died without children, in 1809. His widow, the said Ann, took possession of and claimed his personal estate, or its proceeds, of the amount of eight or ten hundred dollars, under a nuncupative will, in her favor for life, and then to her youngest sister and Ms, equally, in remainder. In 1810, she married Jonathan Key, of North Carolina, and moved there with him. They returned in 1812, and ’ settled in Smith county, bringing with them the negro girl Esther, then very young, of whom all the slaves in controversy are the issue. She was bought in *447 North Carolina for about §275, with a part of the money derived from the Johns’ estate, and title by bill of sale, in the usual form, made to the said Ann in her own name, but without restrictions or limitations over.
Jonathan Key made his will in 1826, and the same was admitted to probate at the February Term, 1828, of Smith County Court. He had a number of children by a former wife, but none by the last. In making provision for her, among other things, he says: “I will and bequeath to my beloved wife, Ann Key, my negro boy Big-Hardy, and girl Esther and her increase, * * at her discretion for ever.”
Lodwick Vaden, being a widower with several children, married the said Ann in 1829 or ’30, and died intestate, in March, 1856. The widow refusing to surrender these slaves upon demand of the administrator, this bill was filed in April, 1856.
It will be seen from this statement that the question is, whether the title of the said Ann was such as to vest in Vaden on the marriage.
The cross-bill only claims one undivided half of said slaves, as it admits that the other half was sold to Key in his lifetime by Henry Beasly, who married Polly Johns, and he is long since dead. McCrary is the second husband of Elizabeth West, and in her behalf claims the other moiety of the remainder in said slaves, under the will of John3. But even as to the moiety of Polly Johns, the administrator’s right to recover is resisted because of the widow’s life estate, which, it is insisted, never became the property of Key, as he only purchased the remainder, of Polly Beasly, which did not of course affect the life estate.
*448 The proof is very voluminous, and is mostly of facts and conversations in relation to the manner in which these slaves were held by the said Ann and her two last husbands. These are, of course, conflicting and contradictory, as might be expected in transactions so ancient, and which are presented in so many phases; and we are left, as in most of such cases, to presumptions of law and of fact arising from the acts and declarations of the parties- to bring us to any conclusion as to their respective rights.
The origin of the remainder right, if it exists at all, must be found in the nuncupative will of Isaac Johns. This is attacked at the outset as invalid, not having been made and established as required by the act of 1784, ch. 22, §§ 15 and 16. This is certainly so, as it is scarcely possible to conceive of a greater departure from the requirements of the act. It does not conform to it in any essential particular. But it was “ established by the Court as the will of said deceased, and ordered to be recorded.” It was not opposed at the time, and has never since been contested. Whether it can now be disregarded, as it has been passed upon and set up by a Court of general jurisdiction of those questions, or shall be held as a matter adjudged and settled by competent authority, not subject to re-examination at any time but by the statutory mode of calling for a reprobate in solemn form, and a trial upon an issue of devisavit vel non, need not now be decided, as the case may be disposed of upon other grounds. In the view we take of the case, the administrator of Lodwick Vaden, who claims the title to the slaves, has no interest in that question; but that it is one which concerns the *449 widow and the complainants in the cross-bill, both of whom recognize and rely upon the will as valid.
According to this will, then, Isaac Johns gives his whole estate, both real and personal, to his wife, Ann, for life, and the remainder to Ms and her youngest sister, equally. The claim set up to these slaves is by her sister and her present husband, to secure their interest thus created in the one-half of this property. It has been before stated that Esther, the mother of all the slaves in controversy, was purchased with $275 of the money derived from Johns’ estate, under this will, and the absolute title by bill of sale taken to herself, while she was the wife of Key, her second husband, in 1811. In 1826, as we have seen, he bequeathed them to his wife Ann as his own, without restrictions or limitations. Key died in 1828, and the slaves remained in the possession of the widow. She married Yaden in 1829 or ’30, and they went with her into his possession, and so continued until his death. There is much proof as to her declarations and of his, in loose conversations, in relation to the title, and this supposed remainder interest was frequently referred to and acknowledged by her, and perhaps by both. But the negroes still continued in the possession and under the control of Yaden, and were managed and used as his own. The neighbors regarded the ownership and character of holding in different lights, according to the different conversations they might happen .to hear, or the constructions placed upon the acts and words of the parties. All this, as it appears in the record, is too vague, uncertain, and contradictory to predicate any right of property upon it, and leaves the case for the operation of the *450 rule, that the title is presumed to he with the posses sion, and the marital right to attach, unless the contrary is made to appear in a reliable and satisfactory mode.
We consider it clearly established, that the title to the girl Esther, at the time of her purchase passed into Key, as the husband of Ann, in 1811, and by his will to her again, in 1828, and upon her marriage with Yaden, in 1830, into him, by virtue of his marital right. Consequently they would constitute a part of his estate at his death. But although this may be so, it is insisted on the other side, that inasmuch as the fund with which they were originally purchased was subject to the remainder of complainants in the cross-bill, after the termination of the life estate, that they have a right to elect whether they will receive the fund or the property in which it was invested by the tenant for life. This is the main and decisive question in the case.
We are not aware that the precise question has ever been adjudicated in this State. But the principle stated in Bonner v. Bonner, 7 Hum., 436, would seem very nearly to meet the case. There the remainderman filed a bill asking security for the safety and forthcoming of slaves obtained in exchange for the one in which they were interested at the end of the life estate. This was refused as to the slaves received by the tenant for life in exchange, the Court saying, ‘‘we are aware of no principle or precedent which would sanction or authorize it.’ It was argued by counsel in that ease, as it is here-, upon the authority of King v. Sharp, 6 Hum., 56, and other authorities, that the tenant for life *451 was trustee for the remainderman, and, consequently, that the latter was entitled to have the original fund or the property, or that in which it might be invested or for which it was exchanged, at his election, upon the general principle on that subject applicable to trustees and beneficiaries. But this argument was considered unsound by the Court. In the case of King v. Smith, 6 Hum., 56, the tenant for life is held to be a quasi trustee, and, further, that “ he may dispose of the property at pleasure, so that he does not thereby injure the inheritance in remainder.” He may not re> move it out of the State so as to endanger the safety of the property, or. destroy it. He may use it, andi make all the profit on it he can, with due regard to. its safety and protection. To that extent he may be-called trustee; but he is not so in the sense of a. pure trust, as a personal representative, guardian, &c.
In North Carolina the precise question has beem more than once before the Court, and explicitly decided. The case of White v. White, 1 Ire. Eq., 441, is exactly in point. That was a case thus stated, in. the abstract: “A. devised to his wife, whom he also appointed his executrix, $1,000» during her life, and after her death to his children.. The wife purchased negroes with this money, and they greatly increased in value, jWeld, that the children, had no right or interest whatever in these negroes, but that they belonged absolutely to the wife. The remaindermen had only the right to the $1,000 at the death of the' wife. Upon a bill, stating that this sum could only be raised out of the-negroes, the Court would, during the life of the wife, decree that they should be held as security for the cap *452 ital sum.” Tbe distinction is there drawn, very clearly, between the case of an executor and other trustees, who cannot use or convert the trust fund so as to make profit to themselves and that of a tenant for life. The cases are certainly very different in principle. In the former case the fund is held entirely and solely for the eestui lque trust, and, consequently, any gain or profit made upon it by its use or exchange should inure to the benefit of the owners. So their right to elect whether they will have the fund with interest, or the property in which their money may have been invested, or the gain upon its use, is secured to them by a most equitable and well established rule. But the case is entirely different with a tenant for life. He has a limited interest in the fund, with a clear right to use and enjoy the profits of it, without accountability for the same to any one. Suppose the fund was used in speculation, or business of any kind in which it might be doubled or quadrupled every year, would any one contend that the remainder could have the advantage of that? If, instead of loaning it, and living upon the interest, it be invested in horses, or slaves, or land, is the right of those in remainder enlarged? Have they any other right but to have the corpus secured ? There is no restriction on the mode of using the money. That must depend upon the will and choice of the tenant for life. If the fund were, by direction of the will, to be invested in slaves, and they to be held as the fund, there would be a trust, and the question would be changed.
In the case cited from Iredell, the tenant for life of the fund was also executrix; and that would make *453 tbe argument more plausible to bold ber to tbe liabilities of a technical trustee as to tbe remaindermen. In this particular that might be a stronger case' than tbe one in band. Black v. Ray, 1 Dev. & Bat. Eq. R., 443, is cited as sustaining the same principle, but we have not been furnished with the book.
We think tbe position well sustained by reason and authority, that a remainderman has no right or claim to the property purchased by a tenant for life of a fund, but that the same is the absolute property of the latter. But it may, where a necessity is shown to exist in a bill framed for that purpose against the tenant for life, be held as a security for the fund used in its purchase. This cross-bill is not with that view, but simply to assert title to the slaves, and resist the claim of the administrator to them as assets.
It also appears that the remainder in the $275 paid for the slave is in no danger, as the tenant for life is perfectly good and solvent, and will be entitled, as dis-tributee of her late husband, Vaden, to a share of these very slaves, besides other property.
Thus we are brought to the conclusion that the slaves in question were the absolute property of Lodwick Vaden at the time of his death, and must be recovered by the administrator by his original bill; and that the cross-bill setting up a claim to the remainder, with a life estate in the widow, must be dismissed. And this affirms the decree of the Chancellor.